**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
DAVID ANNUNZIATO,
                        Plaintiff,

            -against-

COLLECTO, INC., doing business as
EOS CCA,
                      Defendant.
----------------------------------------------------------X

                                **MEMORANDUM OF**
                                **DECISION & ORDER**
                                12-CV-3609 (ADS)(AKT)

<u>**APPEARANCES:**</u>

**Bromberg Law Office, P.C.**
*Attorneys for the Plaintiff*
26 Broadway, 21st floor
New York, NY 10004
        By: Brian L. Bromberg, Esq., Of Counsel

**The Law Office of Joseph Mauro, LLC**
*Attorneys for the Plaintiff*
306 McCall Avenue
West Islip, NY 11795
        By: Joseph Mauro, Esq., Of Counsel

**Zeldes, Needle & Cooper PC**
*Attorneys for the Defendant*
1000 Lafayette Boulevard
Bridgeport, CT 06604
        By: Michael Anthony Carbone, Esq.
            Sabato Pellegrino Fiano, Esq.
            Dominic Spinelli, Esq., Of Counsel

**SPATT, District Judge**.

        This is a class action consisting of 331 former students of the New York Institute of

Technology ("NYIT") who received letters from the Defendant Collecto, Inc., doing business as

EOS CCA (the "Defendant"), in an effort to collect overdue tuition payments and purported

collection fees.  The named Plaintiff David Annunziato (the "Plaintiff"), on behalf of himself and

the absent class members, asserts that these letters violated various provisions of the Fair Debt

Collection Practice Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA").  The class seeks to recover

statutory damages; attorneys' fees; litigation expenses and costs; and declaratory relief.

Presently before the Court is a motion by the named Plaintiff pursuant to Federal Rule

Civil Procedure ("Rule") 56 for summary judgment on the issue of liability.  He also seeks a

ruling from the Court establishing the Defendant's "net worth" as $65,680,444.00 for the

purpose of calculating damages.  Also before the Court is a cross motion by the Defendant for

partial summary judgment dismissing the claims of the class members who allegedly entered into

so-called registration agreements with NYIT regarding the imposition of collection fees.

For the following reasons, the Plaintiff's motion for summary judgment is granted; and

the Defendant's cross motion for partial summary judgment is denied.

## I. BACKGROUND

### A. As to the Facts and the Parties' Contentions

#### 1. As to the Contentions Regarding the Named Plaintiff

The Plaintiff is a resident of New York state.  (See Am. Compl., Dkt. No. 37, at ¶ 3

["Am. Compl."]; Answer to the Am. Compl., Dkt. No. 44 ["Am. Answer"], at ¶ 3.)  He attended

NYIT for an unspecified period of time.  However, according to the amended complaint, he last

attended NYIT sixteen years ago.  (See Am. Compl. at ¶ 14; Am. Answer at ¶ 14.)

The Defendant is a Massachusetts corporation with its principal place of business located

in Massachusetts.  (See Burns Dec. 31, 2015 Decl., Dkt. No. 89-1 ["Burns Decl."], at Ex. 2.)  It

is a collection services agency.  (See id.)

The Defendant contends that at an unspecified time when the Plaintiff registered for

courses at NYIT, he completed a registration form that contained the following language:

> I agree to pay my debt to NYIT for any amounts due for tuition and fees and other
> charges.  In the event that all charges are not paid when due, I agree to pay NYIT

2

all of the costs associated with the collection of my delinquent account, which includes the payment to NYIT of the principal sums due, plus all costs, which may also include, but are not limited to collection agency fees constituting 33 percent of the principal balance due if NYIT engages a collection agency to secure payment, or legal fees constituting 50 percent of the principal balance due if NYIT engages legal counsel to secure payment, plus any and all interest on the outstanding balance at the maximum legal rate allowed by law, and any and all other costs that will be associated with the collection of the delinquent accounts.

(See the Def.'s Rule 56.1 Statement, Dkt. No. 89–2, at ¶ 2 [the "Def.'s 56.1 Statement"].)

In support of its contention that the Plaintiff signed such a registration form, the Defendant offers a declaration by John F. Burns ("Burns"), a corporate advisor to the Defendant, and a blank registration form.  (See Burns Decl. at ¶ 6; id., at Ex. 1.)  However, the Defendant does not attach a copy of a registration form actually signed by the Plaintiff.  In its responses to the Plaintiff's 56.1 statement, the Defendant admits that it "is not in possession of a document actually signed by [the Plaintiff] agreeing to pay any collection cost relating to the alleged debt to the New York Institute of Technology."  (See the Pl.'s Nov. 16, 2015 56.1 Statement, Dkt. No. 87–2 [the "Pl.'s 56.1 Statement"] at ¶ 9.)  However, the Defendant states that at the time it sent the collection letter to the Plaintiff, it believed that "all individuals that had registered and enrolled with the New York Institute of Technology had completed or been provided a registration form and student handbook that provided for an agreement by the student to pay all collection costs relating to the alleged debt."  (Id.)  However, the Defendant provides no evidence of such a policy or a provision in a student handbook.

For his part, the Plaintiff appears to dispute that he signed a registration form with the language contained in the blank form attached by the Defendant.  (See Mauro's Feb. 1, 2016 Decl., Dkt. No. 93–1 ["Mauro's Feb. 1, 2016 Decl."], at ¶ 4.)  In that regard, he attaches as an exhibit a copy of a registration form apparently signed by the Plaintiff's advisor — whose signature is illegible — on April 15, 1992.  (See Mauro's Feb. 1, 2016 Decl., Ex. 3, Dkt. No. 92–

3

1 at Page ID # 1250.) Although the form lists the Plaintiff's name, it is not signed by the Plaintiff

and does not appear to contain the above-described language.  (See id.)

On March 3, 2006, NYIT entered into a collection services agreement with the Defendant

(the "Collection Services Agreement").  (See the Collection Services Agreement, Burns Decl.,

Ex. 2.)  Under the terms of the Agreement, the Defendant agreed to "use its best efforts to collect

accounts referred by [NYIT],"  and NYIT agreed to pay the Defendant a "contingency fee on all

amounts collected on accounts referred to the Agency . . . in the amount of 25% for first

placement accounts and 30% for second placement accounts."  (Id. at ¶¶ 1, 12.)  In addition, the

Agreement required NYIT to pay a contingency fee of 33.3% on all amounts collected on

accounts referred to an attorney for litigation.  (Id.)

On May 16, 2012, the Defendant sent a letter to the Plaintiff, which stated in relevant

part:

COLLECTION PLACEMENT REMINDER

| | | | |
|---|---|---|---|
| Re: | | Principal: | $ 3226.50 |
| Your Account with our Client: | NEW YORK INSTITUTE OF TECHNOLOGY | Interest: | $ 0.00 |
| Client Reference#: | 0078842 | Fees/Coll Costs$: | $1382.79 |
| Agency Account#: | 48128713 | Other Accounts: | $0.00 |
| Original Creditor, if different from Client: | | Total Due: | $4609.29 |

(Am. Compl., Ex. A; see also the Pl.'s 56.1 Statement at ¶¶ 4–5; the Def.'s 56.1 Statement at ¶

3.)

The March 26, 2012 letter to the Plaintiff went on to state:

As a result of your continued failure to address the above referenced account, we
have informed our client that you have not paid this nor made arrangements to
pay. Please be advised that our client has the right to take further steps to collect
this account.

If you cannot pay this account in full, please call to discuss a payment
arrangement today . . . .

4

This communication is from a debt collector.  This is an attempt to collect a debt and any information obtained will be used for that purpose.

(Id.)

It is undisputed that the $1,382.79 in fees and collection costs referred to in the letter represents 42.85% of the $3,226.50 in principal allegedly owed by the Plaintiff to NYIT for his tuition costs.  (See the Pl.'s 56.1 Statement at ¶ 6.)

It is also undisputed that the $1,382.79 for "fees and collection costs" listed in the May 16, 2012 letter does not represent the actual costs incurred by the Defendant in attempting to collect the debt owed by the Plaintiff to NYIT.  (See id. at ¶ 11.)  Rather, the Defendant asserts that it came up with the $1,382.79 figure by applying a method it refers to as the "Make Whole Method" of collection.  (See the Def.'s 56.1 Statement at ¶ 10; see also Burns Decl. at ¶ 14.)  Under that method, the Defendant arrives at a number for collection costs that will permit the creditor — as in, NYIT — to obtain the full amount of its principal after subtracting the Defendant's contingency fee, which in this case was 30 percent.  (See id. at ¶ 10.)  Applying this method to the Plaintiff's account with NYIT, the total debt listed in the May 16, 2012 letter is $4609.29; the fees and collections costs are $1382.79, which is 30 percent of that total amount; and the principal balance on the loan $3226.50.  (See id.)  Thus, if the Plaintiff paid back the total amount listed in this letter, then NYIT would be "made whole" because it would receive the full principal amount on the Plaintiff's debt, even after it pays the Defendant its 30% contingency fee.

**2. As to the Class Members**

As described in more detail below, this Court has previously certified a Rule 23 class action with regard to NYIT defined as:

> All individuals who (a) have mailing addresses within New York State; (b) who
> between July 19, 2011 and July 19, 2012 (c) were sent a collection letter for
> tuition alleged to be owed to New York Institute of Technology in a form
> materially identical or substantially similar to the form letter sent by the
> Defendant to the Plaintiff; (d) regarding a debt that was time-barred by the
> applicable statute of limitations; (e) or containing a collection fee that was
> 42.85% of the principal; (f) which was not returned by the postal service as
> undelivered.

(See Aug. 5, 2015 Order, Dkt. No. 80.)

The class consists of 331 former students of NYIT, not including the named Plaintiff.

(See id.)  It is undisputed that beginning on July 19, 2012, the Defendant sent letters to these 331

class members that were substantially similar to the May 16, 2012 letter that the Defendant sent

to the Plaintiff.  (See the Pl.'s 56.1 Statement at ¶ 12.)  Of importance, the Defendant asserts that

it applied the same "Make Whole Method" to calculate the "Fees/Coll. Costs" listed in the

collection letters to the class members.  (Id. at ¶ 14.)  As such, the Defendant sent each class

member a collection a letter stating that they owed fees and collection costs equal to 42.85% of

the principal amount left on their debts to NYIT.  (Id.)

In its Local Rule 56.1 statement and in its legal memorandum in support of its cross-

motion for summary judgment, the Defendant asserts that "many" of the 331 class members

signed registration statements that contained language similar to the language contained in blank

registration form discussed above — namely, "I agree to pay NYIT all of the costs associated

with the collection of my delinquent account, which includes the payment to NYIT of the

principal sums due, plus all costs, which may also include, but are not limited to collection

agency fees constituting 33 percent of the principal balance due if NYIT engages a collection

agency to secure payment."  (See the Def.'s Dec. 31, 2015 Mem. of Law, Dkt. No. 89–3 [the

"Def.'s Mem. of Law"], at 3–4; the Def.'s 56.1 Statement at ¶ 15.)  However, the Defendant does

not offer any evidence in support of this assertion.  (See the Def.'s 56.1 Statement at ¶ 15.)

The Plaintiff disputes that "many" of the 331 class member signed registration forms containing language similar to the blank registration form offered by the Defendant. Rather, he asserts that only 19 of the 331 class members signed registration forms which contained the language at issue in the blank registration form. (See Mauro's Feb. 1, 2016 Decl. at ¶ 4.) In support of this assertion, the Plaintiff submits registration forms purportedly signed by 19 class members. (See id. at Ex. 4.)

**3. As to the Defendant's 'Net Worth'**

As is described in more detail below, the FDCPA caps damages in class actions **at** $1,000 for the named Plaintiff; and the lesser of $500,000 or 1 per centum of the "net worth of the debt collector" for the class. 15 U.S.C. § 1692k. Here, the parties dispute what the Defendant's "net worth" is within the meaning of the FDCPA.

The Plaintiff asserts that the Defendant's "net worth" is $65,680,444. (See the Pl.'s 56.1 Statement at ¶ 26; see also the Pl.'s Nov. 16, 2015 Mem. of Law, Dkt. No. 87–1 [the "Pl.'s Mem. of Law"], at 14.) In support, he relies on the audited financial statements of EOS Holdings, (USA), Inc. ("EOS Holdings USA") and of EOS International Beteiligungs-Verwaltungsgesellschaft mbH ("EOS International") for the fiscal year ending on February 28, 2014 (the "February 28, 2014 Financial Statements"). (See the Mauro's Nov. 16, 2015 Decl., Ex. F, at p. 25.)

The Defendant is a wholly own subsidiary of EOS Holdings, (USA), Inc. ("EOS Holdings USA"). (See Pl.'s 56.1 Statement at ¶ 27.) EOS Holdings USA is, in turn, a wholly owned subsidiary of EOS International Beteiligungs-Verwaltungsgesellschaft mbH ("EOS International"). (Id. at ¶ 28.)

7

The February 28, 2014 Financial Statements list the Defendant's Total Assets as $84,959,306; and the Defendant's Total Liabilities as $19,278,862. (See Mauro's Nov. 16, 2015 Decl., Ex. F, at p. 25.) To calculate the Defendant's "net worth," the Plaintiff proposes subtracting the Defendant's Total Liabilities from the Defendant's Total Assets, which equals $65,680,444. (See the Pl.'s Mem. of Law at 13.)

The Defendant does not dispute the admissibility of the February 28, 2014 Financial Statements, or the fact that the Statements were prepared in accordance with the Generally Accepted Accounting Principles ("GAAP"). (See the Pl.'s 56.1 Statement at ¶¶ 17–20.) However, it disputes that the $84,959,306 in Total Assets listed on the Financial Statements should be used to calculate its "net worth" under the FDCPA. (Id. at ¶ 23.) Rather, it points to $32,706,493 in "Goodwill" listed on the Financial Statements and contends that "Goodwill" should not be considered **as** an asset for purposes of calculating its "net worth." (See id.) It also urges the Court to refrain from ruling on the "Goodwill" issue until it has heard from accounting experts regarding the meaning of the term. (See id.)

Relevant here, in a May 31, 2013 response to the Plaintiff's interrogatory asking how the $32,706,493 "Goodwill" figure was computed for the fiscal period February 29, 2012, the Defendant stated in relevant part:

> The figure  $32,706,493 on the Consolidated Balance Sheet of EOS Holdings (USA) and Subsidiary for the Fiscal Year February 29, 2012 is derived from three business combinations in which the fair market purchase price of the acquired entities exceed the book value of the tangible assets purchased. Generally Accepted Accounting Principles, calls for the excess to be attributed to goodwill. The amount on the February 29, 2012 consolidated balance sheet is attributable to three components in the following amounts: 1) The acquisition of Collection Company of America in 2011, approximately $18,794,009; 2) The acquisition of AFC in 2009, approximately $141,000; 3) The acquisition of True North AR LLC in 2010, approximately $13,771,000.

8

These amounts do not reflect the cost, at book value of any of the tangible assets of the acquired entities.

(See Mauro's Nov. 16, 2015 Decl., Ex. G.)

For his part, the Plaintiff contends that, as a matter of law, the Court should include the $32,706,493 in "Goodwill" listed on the Defendant's February 28, 2014 Financial Statements as an "Asset" for the purpose of calculating the Defendant's "net worth."  (See the Pl.'s Mem. of Law at 13–14.)

**B. As to the Procedural History**

On July 19, 2012, the Plaintiff commenced this action, alleging that the Defendant violated the FDCPA by sending him and other former students of NYIT collection letters attempting to collect "Fees/Coll Costs" equal to 42 % of the principal balances left on their accounts in tuition costs.

On August 9, 2013, the Court granted the Plaintiff's motion pursuant to Rule 15 to file an amended complaint.  It also granted the Plaintiff's motion pursuant to Rule 23(b)(3) to certify a class action.  However, it amended the Plaintiff's proposed class definition as follows:

(a) all individuals who have mailing addresses within New York State; (b) who within one year before the filing of this action; (c) were sent a collection letter in a form materially identical or substantially similar to the form letter sent by the Defendant to the Plaintiff; (d) regarding a debt that was time-barred by the applicable statute of limitations; (e) and containing a collection fee that they had not previously authorized by entering into an agreement with NY Tech; (f) which was not returned by the postal service as undelivered.

(See the Aug. 9, 2013 Order, Dkt. No. 32, at 22.)

On September 14, 2013, the Plaintiff filed an amended complaint, which left unchanged the majority of the allegations in the original complaint, and asserted the same FDCPA claims against the Defendant.  (See Am. Compl. at ¶¶ 41–48.)

9

On October 15, 2013, the Court granted the Plaintiff's unopposed motion for

reconsideration to correct the Rule 23 class definition as follows:

> (a) all individuals who have mailing addresses within New York State; (b) who within one year before the filing of this action; (c) were sent a collection letter in a form materially identical or substantially similar to the form letter sent by the Defendant to the Plaintiff; (d) regarding a debt that was time-barred by the applicable statute of limitations; (e) **or** containing a collection fee that they had not previously authorized by entering into an agreement with NY Tech; (f) which was not returned by the postal service as undelivered.

(See the Oct. 15, 2013 Order, Dkt. No. 47, at 4–5) (emphasis added).

On March 22, 2014, the Court approved the Plaintiff's proposed class notice and a list of

class members consisting of 464 individuals.  (See the Apr. 12, 2014 Order, Dkt. No. 61, at 2–3.)

Subsequently, on March 25, 2012, the Defendant moved for reconsideration to exclude certain

individuals from the class who it alleged authorized the collection costs listed in the Defendant's

letters.  (See id. 3.)   On April 12, 2014, the Court denied the Defendant's motion because it

found that the Defendant "failed to provide any evidence demonstrating that any of the 464

individuals who received the subject form letter agreed to the 42.85% collection fee."  (Id. at 4.)

On August 5, 2015, the Court so-ordered a joint-request by the parties to amend the class

definition a second time by narrowing the definition of the class from covering all consumers

who received a letter from the Defendant containing a collection fee that they had not previously

authorized by entering into an agreement with NYIT, to limiting the class to consumers who

received a letter from the Defendant requesting a collection cost of 42.85% of the remaining

principal left on their student loan accounts.  (See the Aug. 5, 2015 Order, Dkt. No. 80.)  The

parties represented that this change reduced the class from 484 to 331 individuals.  (Id.)

On November 15, 2015, the Plaintiff moved pursuant to Rule 56 for summary judgment

on the issue of liability, arguing that it was undisputed that the Plaintiff and members of the class

received collection letters charging them collection costs equal to 42.85% of the remaining principal left on their student loan accounts.  (See the Pl.'s Mem. of Law at 9–12.)  They also sought a judgment establishing the Defendant's "net worth" as $65,680,444.00 for the purpose of calculating damages under the FDCPA.  (See id. at 12–14.)

On December 31, 2015, the Defendant filed a memorandum of opposition to the Plaintiff's motion, as well as a cross motion for partial summary judgment dismissing the claims of class members who entered into purported registration agreements with NYIT.  (See the Def.'s Opp'n Mem. of Law at 13.)  In addition, it asserted that an order establishing the Defendant's "net worth" would be premature and improper without expert testimony.  (Id. at 14–15.)

On February 1, 2016, the Plaintiff filed a legal memorandum in further support of his motion for summary judgment and in opposition to the Defendant's motion.  (See the Pl.'s Feb. 1, 2016 Mem. of Law, Dkt. No. 92 [the "Pl.'s Reply Mem. of Law"].)  In it, he asserted that the Defendant had only produced evidence that 19 of the 331 class members signed registration forms and therefore, it was undisputed that the Defendant was liable under FDCPA to at least 312 members of the class who did not sign such forms.  (See id. at 2–3.)  With respect to the 19 members who did sign the forms, the Plaintiff contended that the forms did not expressly authorize the collection costs sought by the Defendant.  (See id. at 3–8.)

On February 22, 2016, the Defendant filed a reply memorandum in further support of its cross motion, that largely incorporated the arguments it made in its prior legal memorandum. (See the Def.'s Feb. 22, 2016 Mem. of Law, Dkt. No. 94 [the "Def.'s Reply Mem. of Law"].) Notably, it did not address the Plaintiff's assertion that at least 312 members of the class who did

11

not sign so-called registration agreements were entitled to summary judgment on the issue of liability.  (See id.)

The Court will now address the relevant legal standards and the parties' positions.

## II. DISCUSSION

## A. As to the Legal Standard

Fed. R. Civ. P. 56(a) provides that a court may grant summary judgment when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."

"A genuine issue of fact means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).  "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986), the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Anderson, 477 U.S. at 249, 106 S. Ct. 2505).  "The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Wright, 554 F.3d at 266 (parenthetically quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).  However, to defeat a motion for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, . . . and may not rely on conclusory allegations or unsubstantiated speculation." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks and citations omitted).

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## B. As to the FDCPA

In 1977, Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e).

To that end, 15 U.S.C. § 1692e ("Section 1692e") states, "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  Section 1692e then provides a list of sixteen non-exclusive examples that constitute violations of the above-prohibition, including as relevant here, "[t]he false representation of . . . the character, amount, or legal status of any debt . . . ," *see* Section 1692e(2)(A); "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken," *see* Section 1692e(5); and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," *see* Section 1692e(10).

In addition, 15 U.S.C. § 1692f ("Section 1692f") states that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."  It also provides a non-exhaustive list of violations of this prohibition, including, "The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  15 U.S.C. § 1692f(1).

13

As referred to earlier, 15 U.S.C. § 1692k ("Section 1692k") creates a civil cause of action for damages for the violation of "any provision" of the FDCPA "in an amount equal to the sum of—(1) any actual damage sustained by such person as a result of such failure; (2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000."  15 U.S.C.A. § 1692k(1)–2(A).  Where, as here, the action has been certified as a class action, a debt collector is liable for "(i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector."  15 U.S.C. § 1692k(2)(B).

Section 1692k also sets forth the following factors that the Court must consider in setting the amount of damages, up to the maximum amounts described above:  "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional."  15 U.S.C. § 1692k(b).

Finally, Section 1692k provides what is sometimes referred to as a *bona fide* error defense whereby a debt collector can avoid liability "if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C.A. § 1692k(c); see also Puglisi v. Debt Recovery Sols., LLC, 822 F. Supp. 2d 218, 226 (E.D.N.Y. 2011) ("This [*bona fide* error] defense, by its terms, requires defendant to demonstrate by a preponderance of the evidence both: (1) that the violation was unintentional; and (2) that it resulted from a bona fide error notwithstanding procedures reasonably adapted to

14

avoid any such error.") (alteration added).  The Court notes that the Defendant does not assert the *bona fide* error defense in its present motion and therefore, the Court does not address it here.

Reading these provisions together, to establish a violation of the FDCPA, "'(1) the plaintiff must be a 'consumer' who allegedly owes the debt or a person who has been the object of efforts to collect a consumer debt, and (2) the defendant collecting the debt is considered a 'debt collector,' and (3) the defendant has engaged in any act or omission in violation of FDCPA requirements.'" Polanco v. NCO Portfolio Mgmt., Inc., 132 F. Supp. 3d 567, 578 (S.D.N.Y. 2015) (quoting Plummer v. Atl. Credit & Fin., Inc., 66 F.Supp.3d 484, 488 (S.D.N.Y. 2014)); see also Aviles v. Wayside Auto Body, Inc., 49 F. Supp. 3d 216, 225 (D. Conn. 2014) (same).

In the present case, it is undisputed that the first two elements — namely, that the Plaintiff and the class members are "consumers" who allegedly owe debts, and the Defendant is a "debt collector" under the FDCPA — are satisfied.  (See the Pl.'s 56.1 Statement at ¶¶ 2–3, 13–14.)  Rather, the dispute centers around whether the Defendant's letters to the class members violated the provisions of Sections 1692e and 1692f described above.

"In this Circuit, the question of whether a communication complies with the FDCPA is determined from the perspective of the 'least sophisticated consumer.'"  Jacobson v. Healthcare Fin. Servs., Inc., 516 F.3d 85, 90 (2d Cir. 2008) (quoting Clomon v. Jackson, 988 F.2d 1314, 1318 (2d Cir. 1993)).  The least sophisticated consumer standard is "an objective standard, designed to protect all consumers, 'the gullible as well as the shrewd.'"  Ellis v. Solomon & Solomon, P.C., 591 F.3d 130, 135 (2d Cir. 2010) (quoting Jacobson, 516 F.3d at 90).  According to the Second Circuit, "[t]he standard effectively serves its dual purpose: it (1) ensures the protection of all consumers, even the naive and the trusting, against deceptive debt collection

15

practices, and (2) protects debt collectors against liability for bizarre or idiosyncratic

interpretations of collection notices."  Clomon, 988 F.2d at 1320.

Further, "[t]o recover damages under the FDCPA, a consumer does not need to show

intentional conduct on the part of the debt collector."  Solomon, 591 F.3d at 135 (2d Cir. 2010).

Rather, "[t]he FDCPA is a strict liability statute, . . . , and the degree of a defendant's culpability

may only be considered in computing damages."  Bentley v. Great Lakes Collection Bureau, 6

F.3d 60, 63 (2d Cir. 1993) (internal quotation marks and citations omitted).

## C. As to Section 1692e

In the present case, the Plaintiff asserts that the collection letters that the Defendant sent

to the class members were "false and deceptive" in violation of Sections 1692e, 1692e(2), and

Section 1692e(10) because the letters listed certain collection costs as part of the class members'

overall debt load without making clear that the collection costs were estimates and were based on

contingency fees that the Defendant had not yet collected.  (See the Pl.'s Mem. of Law at 12; see

also the Pl.'s Reply Mem. of Law at 7–8.)

For its part, the Defendant asserts that some of the class members signed registration

forms authorizing the imposition of collection costs and therefore, the Defendant's letters were

not false or misleading in violation of Section 1692e.  (See the Def.'s Reply Mem. of Law at 5.)

It also argues that to hold the Defendant liable would be inconsistent with its obligation under

1692g(a)(1) to advise consumers of the total amount of their debts.  (Id. at 6.)  The Court

disagrees.

The Court finds a number of the cases cited by the Plaintiff to be persuasive.  For

example, in McLaughlin v. Phelan Hallinan & Schmieg, LLP, 756 F.3d 240 (3d Cir. 2014), the

plaintiff, a homeowner who fell behind on his mortgage, received a letter from a debt collector

stating that the amount of his debt was $365,488.40, which included $650 in attorneys' fees and $550 for costs of suit and a title search.  Id. at 243.  However, the plaintiff asserted in his complaint that the fees and costs had not actually been incurred as of the date he received the letter and therefore, the communication contained false representations as to the amount of his underlying debt to the bank.  See id.

On appeal, the Third Circuit rejected the debt collector's argument that the letter did not violate the FDCPA because it contained an estimate of the amount owed.  Id. at 246.  It reasoned that nothing in the letter conveyed to the debtor that the amount listed was an estimate.  Id. Rather, "[t]he only message this conveys to the reader is the amount owed on a specific date," and "[a]s the drafter of the Letter, [the debt collector] is responsible for its content and for what the least sophisticated debtor would have understood from it."  Id.  Construing as true the allegation that the "amount actually owed as of that date was less than the amount listed," the Court of Appeals found that the plaintiff stated a plausible claim that the "Letter misrepresents the amount of the debt in violation of § 1692e(2) and (10). "  Id.  Accordingly, it reversed the district court's order granting the debt collector's Rule 12(b)(6) motion to dismiss the plaintiff's FDCPA claims.  Id. at 250; see also Kaymark v. Bank of Am., N.A., 783 F.3d 168, 175 (3d Cir. 2015) ("[T]he Foreclosure Complaint also plainly 'inform[ed] the reader of the specific amounts due for specific items as of a particular date,' . . . , two months prior to the date the Foreclosure Complaint was filed. [The complaint] also did not convey that the disputed fees were estimates or imprecise amounts. Thus, pursuant to McLaughlin, the Foreclosure Complaint conceivably misrepresented the amount of the debt owed, forming a basis for violations of § 1692e(2)(A) and (10).").

17

Similarly, in Ardino v. Solomon & Solomon, P.C., No. CIV. 13-1821 (KM), 2014 WL

268680 (D.N.J. Jan. 23, 2014), an attorney entered into a retainer agreement with the plaintiff's

creditor, a New Jersey student loan authority, that provided the attorney with a contingency fee

of 22% for any amount collected from a debtor.  Id. at *1–2. The plaintiff took out a student loan

with the New Jersey authority and executed a promissory note agreeing to "pay all amounts,

including reasonable collection agency and attorneys fees and court and other collection costs

that you incur in effecting collection of this Note, up to the maximum penalty permitted by law."

Id. at *2.  When the plaintiff defaulted on his student loan, the attorney sent a collection letter to

him stating that he owed the principal amount left on his loan, as well as attorneys' fees

representing 22% of that amount.  Id. at *1.  The district court found that the collection letter was

false and misleading in violation of Section 1692e because the collection letter failed to notify

the plaintiff that "the attorneys' fees were not due until actually incurred, and that they would be

calculated on a contingent basis."  Id. at *4.  Further, the court noted that "[w]hile the [the

plaintiffs] agreed to pay costs incurred by [the creditor], they did not agree to pay — and [the

defendant] had no basis to demand — a prospective or estimated fee." Id. (alterations added).

Thus, the district court denied the defendant's Rule 12(b)(6) motion to dismiss the plaintiff's

FDCPA claim.  See id.; see also Kojetin v. C U Recovery, Inc., 212 F.3d 1318 (8th Cir. 2000)

("Contrary to CUR's view, we agree with the district court's conclusion that [the debt collector]

violated the FDCPA when it charged [the debtor] a collection fee based on a percentage of the

principal balance that remained due rather than the actual cost of the collection."); Hernandez v.

Miracle Fin., Inc., No. CIV.A. 11-4074 (JLL), 2011 WL 6328216, at *4 (D.N.J. Dec. 13, 2011)

(finding that a debtor stated a plausible Section 1692e claim against a debt collector for including

a flat collection fee in a communication to the debtor without indicating that the fee was

18

contingent upon the successful collection of the debt); <u>Som v. Daniels Law Offices, P.C.</u>, 573 F. Supp. 2d 349, 358 (D. Mass. 2008) ("The essence of the claim in Counts 3 and 4 thus appears to be that defendants represented that the creditor had incurred a legal expense (a percentage of the entire balance) when in fact it had not (it had incurred only a percentage of the collected balance). Recast in that light . . . Counts 3 and 4 appear to state a claim sufficient to survive dismissal under Rule 12(b)(6).").

Likewise, in this case, it is undisputed that under the terms of the Collection Services Agreement, NYIT agreed to pay the Defendant a contingency fee of between 25 and 33.3% "on all amounts collected on all accounts" that were referred to the Defendant by NYIT.  (<u>See</u> Burns Decl., Ex. 2) (emphasis added).  It is also undisputed that the Defendant sent the Plaintiff a collection letter listing the Plaintiff's "Total Due" as $4609.29, which included $1,382.79 in fees and collection costs.  (<u>See</u> Am. Compl., Ex. A; <u>see also</u> the Pl.'s 56.1 Statement at ¶¶ 4–5; the Def.'s 56.1 Statement at ¶ 3.)  However, pursuant to the contingency agreement, the Defendant had not yet collected anything from the Plaintiff prior to sending this letter, and therefore was not then entitled to any collection costs.  Accordingly, the $1,382.79 in fees and collection costs listed in the letter is at best an estimate of what the Defendant's actual fees and collection costs might be.

However, nowhere in this letter does the Defendant indicate that the total amount due reflects an estimate of the Defendant's collection costs.  Rather, the Defendant lists the collection costs as part of the Plaintiff's overall debt.  Therefore, the Court finds that the least sophisticated consumer could easily misinterpret the Defendant's letter to mean that the Plaintiff actually owed $1,382.79 in collection costs, when it fact it did not.  As the cases above establish, such misinformation about the amount of a debt is a clear violation of Section 1692e(2).  <u>See</u>

McLaughlin, 756 F.3d at 246 ("Nothing [in the debt collection letter] says it is an estimate or in any way suggests that it was not a precise amount. As the drafter of the Letter, [the debt collector] is responsible for its content and for what the least sophisticated debtor would have understood from it."); McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 911 F. Supp. 2d 1, 59 (D. Mass. 2012) ("Stating an incorrect amount of the debt undeniably violates section 1692e(2)(A)").

Furthermore, it is undisputed that the Defendant sent similar letters to all of the 331 class members that listed fees and collection costs equal to 42.85% of the principal amounts left on their loans.  (See the Pl.'s 56.1 Statement at ¶ 14.)  As these letters were sent *before* the Defendant actually collected any money from the former students, the Court finds that the fees and collection costs listed in the letters were also misleading and constituted violations of Section 1692e(2).

The Defendant seeks to avoid liability by asserting that "many" of the class members entered into registration agreements authorizing the imposition of collection fees that included contingency fees paid to debt collectors, such as the Defendant.  (See the Def.'s Mem. of Law at 4–5.)  The Court disagrees for two reasons.

First, the Defendant has produced no evidence, other than an unsupported statement in its legal memorandum, that any of the class members signed so-called registration agreements that in the event of a default, authorized NYIT to charge them for collection costs based on a percentage of the principal left on their loans.  Rather, it offers a blank registration form, not signed by any of the class members, and a declaration by Burns stating that the Plaintiff completed a similar registration form.  Though again, it offers no evidence to support this assertion. (See Burns Decl. at ¶ 6; see also id. at Ex. 1.)

20

On the other hand, the Plaintiff asserts that 19 of the 331 class members, not including the Plaintiff, signed registration forms similar to the blank form offered by the Defendant.  (See Maura Decl. at ¶ 4.)  In support, he offers copies of 19 forms signed by certain class members, see id. at Ex. 4; and a declaration by Joseph Mauro, Esq. ("Mauro"), class counsel, in which he represents that after reviewing the documents produced by the Defendant, these 19 forms were the only forms that he was able to identify that were signed by members of the class, see id. at ¶ 4.  The Defendant does not dispute either of these assertions and offers no evidence to the contrary.  (See the Def.'s Reply Mem. of Law at 4–6.)

Thus, it appears undisputed that only 19 of the 331 class members signed registration forms.  Therefore, even assuming arguendo that the forms did authorize the Defendant to include an estimate of collection costs in letters to the class members, summary judgment would still be appropriate for the 312 class members who did not sign such forms.

Second, and more importantly, the language in the registration form does not help the Defendant's cause.  The form states, "In the event that all charges are not paid when due, I agree to pay to NYIT all of the costs associated with the collection of my delinquent account, which includes the payment to NYIT of the principal sums due, plus all costs, which may also include but are not limited to collection agency fees constituting 33 percent of the principal balance due if NYIT engages a collection agency to secure payment."  (See Burns Decl., Ex. 1 (emphasis added); see also Maura Decl., Ex. 4.)

The plain language of the registration form indicates that 19 class members agreed to pay all costs associated with the collection of their debts, including collection fees based on a percentage of the principal balance due.  However, the class members did not agree to be charged for collection fees and costs that were not yet incurred by NYIT, nor did they authorize

the Defendant to demand an estimate of prospective collection fees and costs.  Thus, the Court

does not find that the registration forms signed by 19 of the class members sufficient to raise a

genuine issue of material fact as to the Defendant's liability under Section 1692e.  See Ardino,

2014 WL 268680 at *4 ("While the [the debtor] agreed to pay costs incurred by [the creditor],

they did not agree to pay—and [the debt collector] had no basis to demand—a prospective or

estimated fee.").

        The cases cited by the Defendant are not to the contrary.  In those cases, consumers

brought FDCPA claims against attorneys, acting as debt collectors, who sought to collect

attorneys' fees from the consumers based on contingency fees.  The district courts dismissed

FDCPA claims because the consumers had signed agreements authorizing the creditors to charge

them "reasonable attorneys fees" in collecting on the delinquent accounts.  See Shapiro v. Riddle

& Associates, P.C., 351 F.3d 63, 64 (2d Cir. 2003) (finding no error in a district court's

determination that "there was no genuine issue of material fact with regard to this [FDCPA]

claim because the agreement between [the attorney-debt collector] and the creditor authorized

[the attorney] to charge [the debtor] a reasonable fee and because the $98 charge was reasonable

in light of 'the undisputed evidence' of [the attorney's] work on [the debtor's] letter."); Mayhall

v. Berman & Rabin, P.A., No. 4:13CV0175 AGF, 2014 WL 340215, at *6 (E.D. Mo. Jan. 30,

2014) ("[B]ecause the recovery of reasonable attorney's fees is expressly permitted by the credit

card agreement and, as discussed below, a fixed percentage fee is not unreasonable as a matter of

law, Defendant's request for approval of such a fee award did not violate the FDCPA's

proscription on the collection of amounts not expressly authorized by the agreement or permitted

by law."); Cisneros v. Neuheisel Law Firm, P.C., No. CV06-1467 (DGC), 2008 WL 65608, at *2

(D. Ariz. Jan. 3, 2008) (finding that a defendant's request for attorneys' fees based on a

contingency fee did not violate the FDCPA because "the underlying agreement provides for the recovery of 'reasonable' attorneys' fees; it is not limited to 'actual' attorneys' fees); Kirscher v. Messerli & Kramer, P.A., No. CIV. 05-1901 (PAM) (RLE), 2006 WL 145162, at *5 (D. Minn. Jan. 18, 2006) (finding that a demand for attorneys' fees did not violate the FDCPA because "[t]he contract between Kirscher and Discover Bank expressly provided that Discover Bank could charge Kirscher for reasonable attorneys' fees and litigation costs incurred in collecting the debt.").

Here, the Defendant sought to charge the class members collection fees of 42% of their remaining debts even though the Defendant was operating on a contingency fee agreement under which it could only recover a fixed contingency fee based on the "amounts collected." While 19 of the 331 class members signed registrations forms agreeing to "pay all costs associated with the collection of my delinquent account," they did not, contrary to the consumer in the cases discussed above, agree to be charged for a "reasonable" amount of fees, and they certainly did not agree to be charged for collection fees that bore no relationship to the Defendant's *actual costs* of collection.  For this reason, the Court finds the cases cited by the Defendant to be distinguishable.  See Gathuru v. Credit Control Services, Inc., 623 F.Supp.2d 113, 121–122 (D. Mass., 2009) (granting summary judgment in favor of plaintiff and finding that a collection notice falsely represented the amount due where defendant attempted to collect a contingent fee not yet due);  Kojetin v. CU Recovery, Inc., No. CIV.97-2273(JRT/RLE), 1999 WL 1847329, at *2 (D. Minn. Mar. 29, 1999) (alteration added) ("Under the terms of the note, [the debtor] is required to pay only the actual costs of the collection efforts. [The debt collector's] inclusion of the percentage fee amount in the notice, therefore, violated the FDCPA[.]"), *aff'd sub nom.* Kojetin v. C U Recovery, Inc., 212 F.3d 1318 (8th Cir. 2000).

Finally, the Defendant asserts that a finding of liability under Section 1692e would be inconsistent with its obligations under 15 U.S.C. § 1692g ("Section 1692g"), which requires a debt collector to provide the consumer with a written notice containing among other things, "the amount of the debt" sought to be collected.  (See the Def.'s Reply Mem. of Law at 5–6.)

The Defendant offers no legal support for this contention.  Furthermore, the plain language of the Section 1692g(a)(1) requires a debt collector to provide a written notice "of the amount of the debt," not the *potential* amount of borrower's debt, or an *estimate* of the borrower's debt.  Thus, contrary to what the Defendant appears to contend, Section 1692g(a)(1) did not require it to include an estimate of a potential contingency fee due in its debt collection letter.  Thus, the Court sees no tension between the Defendant's obligation under Section 1692g(a)(1) and the Court's finding — supported by a wealth of authority discussed above — that the Defendant's collection letters violated Section 1692e(2).

In sum, the Court finds that there are no genuine issues of material fact as to whether the Defendant's collection letters to the class members violated Section 1692e.  Therefore, it grants the Plaintiff's motion for summary judgment as to the class members' Section 1692e claims; and denies the Defendant's cross-motion for partial summary judgment as to the same claims.

**D. As to Section 1692f**

For similar reasons, the Court finds that the Defendant has failed to raise a genuine issue of material fact as to its liability under Section 1692f.

As discussed earlier, Section 1692f states that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.  Under the statute, a debt collector violates this provision through "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is

expressly authorized by the agreement creating the debt or permitted by law." Id. at § 1692f(1);

see also Tuttle v. Equifax Check, 190 F.3d 9, 13 (2d Cir. 1999) ("If state law neither

affirmatively permits nor expressly prohibits service charges, a service charge can be imposed

only if the customer expressly agrees to it in the contract."); see also Staff Commentary on the

Fair Debt Collection Practices Act, 53 Fed. Reg. 50,097, 50,108 (Fed. Trade Comm'n 1988)

(same).

    In the present case, the Plaintiff contends that the Defendant listed fees and collection

costs in its letters to the class members that were not authorized by law or an agreement and

therefore, the letters violated Section 1692f(1).  (See the Pl.'s Mem. of Law at 10–11.)

    The Defendant contends that the some of the class members signed registration forms

that expressly authorized the collection of fees and costs sought in its letters to the class

members.  (See the Def.'s Opp'n Mem. of Law at 9–13.)  As such, it moves to dismiss the claims

of class members of who signed the registration forms.  (See id. at n.4.)  Again, the Court

disagrees.

    The Court finds Bradley v. Franklin Collection Serv., Inc., 739 F.3d 606 (11th Cir. 2014)

(Per Curiam) to be instructive.  There, the plaintiff, a patient, signed an agreement with a medical

practice prior to receiving treatment stating, "I agree to pay all costs of collection, including a

reasonable attorney's fee[.]"  Id. at 609.  The practice had an agreement with the defendant-debt

collector whereby it agreed to add 33 and 1/3% to a debt prior to referring it to the defendant for

collection, and to pay the defendant a 30% contingency fee of the total amount collected on each

debt.  Id.  After the patient failed to pay his medical bill, the practice added a 33 and 1/3

collection fee to his principal balance and referred his account to the defendant for collection.  Id.

25

The debt collector demanded payment, and the plaintiff sued the debt collector under the FDCPA for the unauthorized collection of a fee.  See id.

On appeal in Bradley, the Eleventh Circuit found that the patient's agreement with the practice "to pay all costs of collection" did not expressly authorize the debt collector to add a 33– and–1/3% "collection fee" to his account because he agreed to pay the actual costs of collection, and the debt collector "failed to direct th[e] Court to any evidence that the 33–and–1/3% 'collection fee'—which was assessed before [the debt collector] attempted to collect the balance due—b[ore] any correlation to the actual cost of [debt collector's] collection effort."  Id. at 609– 10 (alterations added).  Because there was no express agreement between the practice and the patient allowing for the collection of 33–and–1/3% fee, the Court of Appeals found that the fee violated Section 1692f(1).  Id. at 610.

Also, in Kaymark v. Bank of Am., N.A., 783 F.3d 168 (3d Cir. 2015), the plaintiff-borrower entered into an agreement with his bank, which stated that in the event he defaulted on his mortgage, he would pay "the collection of certain fee categories, such as 'attorneys' fees, property inspection and valuation fees.'"  Id. at 175.  The agreement also specified that the bank could only charge the plaintiff for "'services performed in connection with' the default and collect 'all expenses incurred' in pursuing authorized remedies."  Id.  After the plaintiff defaulted on his mortgage, the bank initiated a foreclosure action against him in state court, and in the complaint sought $2,050 in attorneys' fees, title report fees, and inspection fees.  Id. at 173.  The plaintiff then brought suit under the FDCPA against the bank alleging that the complaint contained misrepresentations regarding the amount owed and improperly sought to collect unauthorized fees.  Id.  On appeal, the Third Circuit found that the district court erred in dismissing the complaint because, among other things, the most natural reading of the language

26

in the plaintiff's agreement with the bank was that the bank "was not authorized to collect fees for not-yet-performed legal services and expenses." Id. at 175–76.  Because the plaintiff alleged that the defendant sought to collect fees for legal services and expenses before they had actually been incurred, the court found that the plaintiff had assert a plausible claim under Section 1692f(1).  Id. at 175–76.

Similarly, in this case, 19 class members signed registration forms, each of which stated in relevant part, "I agree to pay NYIT all of the costs associated with the *collection* of my delinquent account . . . , which may also include, but are not limited to collection agency fees constituting 33 percent of the principal sums due if NYIT engages a collection agency to secure payment."  (See Burns Decl., Ex. 1) (emphasis added).  Thus, construing the plain language of the form, the 19 class members agreed that in the event they failed to pay their student loans, they would pay the remaining principal left on their loans, plus the *actual* costs of collection and the *actual* collection agency fees, including but not limited to 33 percent of the principal sums due.

However, the Defendant provided no evidence that the 42 percent contingency fee it sought to charge the class members in the debt collection letters bore any relationship to the actual collection costs.  To the contrary, it is undisputed that NYIT was only obligated to pay the Defendant a contingency fee on "amounts collected."  (See Burns Decl., Ex. 2, at ¶ 12.)  It is also undisputed that the Defendant sent collection letters to the class members *prior to* collecting any principal from the class members.  (See the Pl.'s 56.1 Statement at ¶ 11.)  Thus, the collection fees and costs sought by the Defendant in its letters to the class members did not reflect the actual costs associated with collecting the class members' delinquent accounts because the Defendant was not entitled to contingency fees until after it collected the debts to NYIT.

27

Accordingly, the Court finds that the registration agreements signed by 19 of the class members did not expressly authorize the Defendant's attempt to collect 42% contingency fees, as the Defendant contends.  See Bradley, 739 F.3d at 610 (finding that a debt collector violated Section 1692f(1) by collecting a contingency fee because "[u]nder the contract at issue here, Bradley agreed to pay the actual costs of collection; he did not agree to pay a percentage above the amount of his outstanding debt that was unrelated to the actual costs to collect that debt.").

For these reasons, the Court finds that the Defendant has failed to raise a genuine issue of material fact as to its liability under Section 1692f(1).  Accordingly, the Plaintiff's motion for summary judgment as to liability on its Section 1692f(1) claim is granted; and the Defendant's partial motion for summary judgment on the same claim is denied.

## E. As to Defendant's 'Net Worth'

The Plaintiff also requests an order that "for the purposes of assessing the proper statutory damages in this case, the Defendant's 'net worth' is $65,680,440."  (See the Pl.'s Mem. of Law at 14.)

As noted earlier, Section 1692k(a)(2)(B) states that in the case of a class action, a debt collector who has failed to comply with any provision of the FDCPA is liable to the class in an amount equal to:

> (i) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 per centum of the net worth of the debt collector[.]

15 U.S.C.A. § 1692k(a)(2)(B) (emphasis added).

The Court then has discretion under the statute to determine the amount of damages up to to the maximum amount in light of the following non-exclusive factors— "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the

resources of the debt collector, the number of persons adversely affected, and the extent to which

the debt collector's noncompliance was intentional."  15 U.S.C. § 1692k(b)(2).

"Net worth" is not defined by the FDCPA.  Although the Second Circuit has not

addressed the issue, other courts that have held that "net worth" should be calculated according

to the "book value of the company," as in the company's total assets minus the company's total

liability as reported on its balance sheet consistent with the generally accepted accounting

principles ("GAAP").  See Sanders v. Jackson, 209 F.3d 998, 1001 (7th Cir. 2000)

("Accordingly, because there is no indication in the FDCPA that the term net worth should be

used in anything but its normal sense, we also look to book net worth or balance sheet net worth

as reported consistently with GAAP."); Stolicker v. Muller, Muller, Richmond, Harms, Myers &

Sgroi, P.C., No. 1:04-CV-733, 2006 WL 1547274, at *3 (W.D. Mich. June 2, 2006) ("[T]he

Court adopts the approach of the Seventh Circuit in Sanders and finds that the term net worth, as

used in the FDCPA, means book value net worth or balance sheet net worth[.]").

In the present case, the Plaintiff relies on the Defendant's February 28, 2014 Financial

Statements, which list the Defendant's total assets as $84,959,306 and its total liabilities as

$19,278,862.  (See Mauro's Nov. 16, 2015 Decl., Ex. F, at p. 25.)  Thus, the Plaintiff contends

that the Defendant's "book value" according to the GAAP is $65,680,440 and urges the Court to

adopt that figure as the Defendant's "net worth" for the purpose of calculating statutory damages

under the FDCPA.  (See the Pl.'s Mem. of Law at 13.)  Construed in this way, the Defendant's

maximum liability under Section 1692k is equal to the lesser of $500,000 or 1% of $65,680,440,

which is $656,804.40.  Thus, according to the Plaintiff, the Defendant's maximum liability to the

class for statutory damages should be set at $500,000.

For its part, the Defendant does not dispute the accuracy of the February 28, 2014 Statements or that the Statements were created in accordance with the GAAP.  (See the Pl.'s 56.1 Statement at ¶¶ 17–19.)  It also does not appear to dispute that "net worth" under the FDCPA should be calculated according to the Defendant's "book value."  However, the Defendant contends that the Court should subtract the $32,706,493 listed on its Financial Statements as "Goodwill" from its "net worth."  (See the Def.'s Opp'n Mem. of Law at 14.)  The Court disagrees for a number of reasons.

First, the $32,706,493 in "Goodwill" is listed as an "asset" on the Defendant's February 28, 2014 Financial Statements.  The Defendant fails to explain why a figure listed on its *own* financial disclosures as an "asset" should not be included in calculating the value of its company.  Indeed, the Defendant does not dispute that the Financial Statements are accurate and were prepared according to the GAAP.  If GAAP requires the Defendant to report this "Goodwill" as an asset, then why should the Court not calculate it as such in determining the Defendant's "book value"?  The Defendant fails to answer that question..

Second, the Defendant points out that in Sanders v. Jackson, *supra*, a case relied on by the Plaintiff, the Seventh Circuit expressly held that "goodwill" should not be included in the calculation of the Defendant's "net worth" for purposes of Section 1692k.  (See the Def.'s Opp'n Mem. of Law at 14–15.)

In Sanders, the plaintiff urged the district court to calculate the defendant's "net worth" under the FDCPA based on the "fair market value of the company," which included internally developed "goodwill"; while the defendant urged the court to adopt the GAAP method of calculating the company's "book value."  See Jackson, 209 F.3d at 999.  The district court adopted the latter approach, and the Seventh Circuit agreed on appeal.  Id.  In so doing, the

30

Circuit Court held, analogizing to other statutes, that "net worth" should be calculated according to the GAAP. <u>See id.</u> at 1001. The Seventh Circuit defined "goodwill" as "an intangible asset that represents the ability of a company to generate earnings over and above the operating value of the company's other tangible and intangible assets." <u>Id.</u> at 1000 n.1 (internal quotation marks and citations omitted). It then noted that under the GAAP, "goodwill is not reported <u>absent a business combination</u> because 'its lack of physical qualities makes evidence of its existence elusive, [and] its value . . . often difficult to estimate, and its useful life . . . indeterminable." <u>Id.</u> at 1002 (emphasis added) (quoting Accounting Principles Board, Opinion. No. 17, ¶ 17.02 (1970)). As the plaintiff's proffered "goodwill" valuation of the company was *not* reported on the company's balance sheet as an asset, the Court of Appeals found that it would be inconsistent to include it in the calculation of the company's "net worth" under the FDCPA. <u>See id.</u> at 1001– 02 ("The balance sheet does not report goodwill. While Sanders contends that we should increase Universal Fidelity's listed assets by the value of its goodwill, which at this point is unknown, that would be inconsistent with GAAP . . . . Thus, applying GAAP, as we believe Congress would have wanted, . . . balance sheet valuation should not include goodwill.") (alterations added, internal citations omitted).

Here, by contrast, we have the exact opposite scenario. The Defendant *did* report "goodwill" on its balance sheet as an asset. Further, unlike the plaintiff in <u>Sanders</u>, the Defendant states that the $32,706,493 listed on its balance sheet as "goodwill" was the result of a "series of business combinations," and therefore was properly reported as an "asset" in accordance with the principles of GAAP. (<u>See</u> the Pl.'s 56.1 Statement at ¶ 23; <u>see also</u> the Def.'s May 31, 2013 Responses to the Pl.'s Interrogs., Dkt. No. 87–9.) Thus, applying the

31

principles of GAAP as outlined in <u>Sanders</u>, the $32,706,493 is reportable as an asset and should therefore be included in the calculation of the Defendant's "net worth."

Third, the Defendant asserts that the Court should not determine the meaning of "goodwill" without the benefit of expert accountant testimony.  (<u>See</u> the Def.'s Opp'n Mem. of Law at 14.)  However, the Court need not rely on expert testimony, where, as here, the Plaintiff has offered a balance sheet and persuasive case law establishing how to calculate the Defendant's "net worth."  The Defendant was, of course, free to file an expert report with its cross-motion disputing the Plaintiff's theory.  However, it did not do so, nor did it offer any evidence to the contrary.  Rather, it simply attacks the Plaintiff's proof with unsupported assertions.  That is not enough to create a genuine issue of material fact on this issue.  <u>See</u> <u>Robinson v. Concentra Health Servs., Inc.</u>, 781 F.3d 42, 44 (2d Cir. 2015) ("[The opposing party] must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.")  (internal quotation marks and citations omitted).

For these reasons, the Court finds that there is no genuine issue of material fact that the Defendant's "net worth" is $65,680,440.  Accordingly, the Court grants the Plaintiff's request and holds that the maximum amount of statutory damages that the class is entitled to under the FDCPA is $500,000.

**F. As to the Documents Filed Under Seal**

Finally, the Court notes that the Plaintiff, without obtaining leave of the Court, filed his entire motion for summary judgment under seal and redacted large portions of his papers and the exhibits attached to them.  (<u>See</u> Dkt. No. 86.)  This was improper.

Judicial records are presumptively open to public inspection.  See United States v. Amodeo, 44 F.3d 141, 145 (2d Cir. 1995).  A party seeking to maintain judicial documents under seal bears the burden "of demonstrating what 'higher values' overcome the presumption of public access and justify sealing."  E.E.O.C. v. Kelley Drye & Warren LLP, No. 10 CIV. 655 (LTS) (MHD), 2012 WL 691545, at *3 (S.D.N.Y. Mar. 2, 2012) (citation omitted); see also DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 826 (2d Cir. 1997) ("The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action.").

In addition, this District maintains specific procedures for filing documents under seal that can be found on its website, *see https://www.nyed.uscourts.gov/forms/steps-e-filing-sealed-documents-civil-cases*.  In particular, parties are required to file a motion for leave to e-file a document under seal prior to filing that document under seal, and only after the Court rules on the motion, will the requested documents be filed under seal.  See id.

Here, the Plaintiff has offered no legal basis for overcoming the presumption of public access to his motion papers.  Nor has he requested leave to file documents under seal.

Accordingly, the Court directs the Plaintiff to show cause within five days of the date of this Order why the Court should not unseal his motion for summary judgment, his supporting memorandum of law, all of the documents attached to it, and this Order.

Further, this Order refers to information that has been redacted by the Plaintiff, and therefore, the Court directs the Clerk of the Court to temporarily seal this Order.  If the Plaintiff fails to respond to the Court's order to show cause, the Court will direct the Clerk of the Court to immediately unseal his motion and this Order.

## III. CONCLUSION

For the foregoing reasons, the Plaintiff's motion for summary judgment is granted in its entirety; and the Defendant's cross motion for partial summary judgment is denied.

Further, within five days of the date of this Order, the Plaintiff is directed to file a letter showing cause as to why the Court should not unseal his motion for summary judgment and this Court's Order.

Finally, the parties are directed to file a letter within 14 days of the date of this Order regarding how they plan to proceed with the damages phase of this litigation.

**SO ORDERED.**
Dated: Central Islip, New York
September 19, 2016

*/s/ Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge